# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| E'LISE Z. HENSLEY, TWANA S. MITCHELL, and NIKKEA S. WILSON, | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 1:15-CV-00077-RWS |
| v. | : : | |
| S.G.T., INC., *et al.*, | : : | |
| Defendants. | : : | |

## **ORDER**

This case comes before the Court on Defendants' Motions to Compel Arbitration [6, 14]. After reviewing the record and conducting an evidentiary hearing, see 9 U.S.C. § 4, the Court enters the following Order.

## **Background**

Plaintiffs brought this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, to recover unpaid minimum and overtime wages. Defendants include the owners and managers of the nightclub Pleasers. Plaintiff E'lise Z. Henlsey worked as a dancer at Pleasers from approximately

June 2011 until August 2014, when the club burned down.[1] Plaintiff Twana S. Mitchell was also a dancer from about November 2009 until August 2014. Plaintiff Nikkea S. Wilson worked as a bartender at Pleasers from March 2011 until August 2014.

Defendants seek to compel arbitration based on an arbitration agreement they say Plaintiffs agreed to by either signing or continuing to work once Plaintiffs were advised of the new arbitration policy. Plaintiffs deny that they entered into a valid arbitration agreement.

The Court finds that in February 2014, Defendants sought to implement a new arbitration policy for its dancers that required the dancers and Pleasers to submit covered claims (including FLSA claims) to arbitration on an individual basis. (See Dkt. [6-1] at 6.) On February 14, 2014, manager Jason Dorsey called Mitchell into his office to meet with her about the arbitration policy. Nobody else was in the office. Mitchell stated that the meeting lasted just a few seconds, while Dorsey testified that he met with each dancer for three to six minutes. In any event, the meeting was brief. Dorsey told Mitchell to sign

---

[1]The Court does not decide whether Plaintiffs were employees or independent contractors.

2

a piece of paper that was on the edge of his desk. The single page was the last of a three-page arbitration agreement. The final page contained the following paragraphs in bold caps:

> AS TO ENTERTAINERS OR OTHER INDEPENDENT CONTRACTORS OF PLEASERS: THE SUBMISSION OF AN APPLICATION, AUDITION AS AN ENTERTAINER, ACCEPTANCE AS AN ENTERTAINER OR THE CONTINUATION BY YOU AS AN ENTERTAINER SHALL BE DEEMED TO BE ACCEPTANCE OF THIS AGREEMENT. NO SIGNATURE SHALL BE REQUIRED FOR THE AGREEMENT TO BE APPLICABLE. THE MUTUAL OBLIGATIONS SET FORTH IN THIS AGREEMENT SHALL CONSTITUTE A CONTRACT BETWEEN YOU AND PLEASERS BUT SHALL NOT CHANGE YOUR CONTRACTUAL RELATIONSHIP TERMINABLE AT WILL BY EITHER PARTY WITH OR WITHOUT NOTICE TO THE OTHER PARTY, OR ANY TERM OF ANY OTHER CONTRACT OR AGREEMENT BETWEEN PLEASERS AND YOU. THIS AGREEMENT SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN YOU AND PLEASERS FOR THE RESOLUTION OF COVERED CLAIMS.
>
> I ACKNOWLEDGE RECEIPT OF THIS ARBITRATION POLICY AND AGREEMENT–ENTERTAINERS.

(Dkt. [6-1] at 8.)

Dorsey told Mitchell she was required to sign it but did not tell her if there were any consequences of refusing to sign. However, Mitchell testified that she heard a piece of paper was circulating and that the dancers needed to

3

sign it or they would be "let go." She signed the paper, conceding she did not read the contents and did not care what they said. She did not receive a copy to take with her.

Hensley never met with Dorsey. She testified that she was approached in the changing room by a bartender known as Star, another Plaintiff in this action whose legal name is Nikkea S. Wilson. Wilson told Hensley that she needed to sign a document or would get in trouble. Hensley refused and was not told what the document was, although she believes it was the arbitration agreement. Wilson later testified that the document was not an arbitration policy at all but was an employee handbook. While Dorsey testified that he met with Hensley about the arbitration policy, he acknowledged that Hensley did not sign the agreement and that he told her she was not required to sign it. There is no evidence Hensley read the document. So, even if Hensley and Dorsey actually met, the Court finds that Hensley never signed the arbitration agreement, did not receive a copy of it, did not know its terms, and believed there were no consequences of not signing it.

By August 2014, Pleasers decided to implement an arbitration agreement applicable to all employees, including bartenders like Wilson. Wilson did not

4

meet with Dorsey until August 21, 2014, a few of days before Pleasers burned. Wilson went back to Dorsey's office during her shift to get change for her customers. At that time, Dorsey asked her to sign a document. He told her she had to sign it or she would not have a job. When she signed, she was only given the final page and did not know what arbitration was. Before leaving Dorsey's office, Dorsey gave her two or three pages of the agreement. She returned to work the next day, which was her last before Pleasers burned down.

## Discussion

### I. The Federal Arbitration Act

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "embodies a 'liberal federal policy favoring arbitration agreements.'" Hill v. Rent-A-Center, Inc., 398 F.3d 1286, 1288 (11th Cir. 2005) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). Furthermore, "courts have consistently found that claims arising under federal statutes may be the subject of arbitration agreements and are enforceable under the FAA." Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1313 (11th Cir. 2002). Arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of the contract." 9

U.S.C. § 2. The FAA "give[s] arbitration agreements the same force and effect as other contracts," and "state law generally governs whether an enforceable contract or agreement to arbitrate exists." Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1367-68 (11th Cir. 2005). Under the FAA, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.

## II. Analysis

Plaintiffs argue that they did not enter into arbitration agreements because Defendants did not make a definite offer and Plaintiffs never communicated acceptance of the agreement. Moreover, Plaintiffs assert that the arbitration agreements are procedurally and substantively unconscionable. The Court first analyzes whether Defendants made, and Plaintiffs accepted, any offer before turning to unconscionability.

### A. Offer and Acceptance

Under Georgia law, "[a] definite offer and complete acceptance, for consideration, create a binding contract." Moreno v. Strickland, 567 S.E.2d 90, 92 (Ga. Ct. App. 2002). "An offer may be accepted . . . either by a promise to

6

do the thing contemplated therein, or by the actual doing of the thing. The offer must be accepted in the manner specified by it; and if it calls for a promise, then a promise must be made; or if it calls for an act, it can be accepted only by the doing of the act." Id. (internal quotation marks omitted). In that regard, "Georgia courts have held that an employee can accept new terms of employment of which the employee is aware by remaining in employment." Caley, 428 F.3d at 1374 (citing Fletcher v. Amax, Inc., 288 S.E.2d 49, 51 (Ga. Ct. App. 1981)).

   *1.   Mitchell*

Mitchell briefly met with Dorsey, and she admits signing the contract. She stated Dorsey did not explain what the agreement was, but she further admits she did not care. She was also aware that an agreement was circulating and that dancers were required to sign it to keep their jobs. So, she signed it without reading and kept working.

"A person is bound by any contract he signs without reading unless he can show: (1) an emergency at the time of signing that would excuse his failure to read; (2) the other party misled him by an artifice or device which prevented him from reading; or (3) a fiduciary or confidential relationship existed on

7

which he relied in not reading the contract." Stamps v. JFB Props., LLC, 694 S.E.2d 649, 651 (Ga. 2010).

Mitchell does not show any of the above factors were present. The only possible factor at issue is that Defendants misled her to prevent her from reading the agreement. Even assuming Dorsey did not explain the terms of the agreement, Mitchell admits she chose not to read the contract and did not care what the contents were. Moreover, Plaintiffs acknowledge that the fact they were presented with the final page of the agreement, standing alone, does not defeat the contract. (Pls.' Resp., Dkt. [13] at 6.) The Court therefore finds that Defendants offered and Mitchell accepted the contract because she signed it and Defendants did not mislead her to prevent her from reading it.[2]

### 2. *Hensley*

Hensley denies ever meeting with Dorsey about an arbitration agreement. Hensley never signed the agreement and testified that she never received a copy of it, either. In fact, the only time she thought she might have been

---

[2]There was testimony regarding the amount of alcohol each Plaintiff had consumed when she was asked to sign the agreement. Each Plaintiff stated she either had a modest amount to drink or could function well with the amount she consumed during her shifts. As a result, the Court finds that alcohol consumption does not impact whether Plaintiffs validly entered into an arbitration agreement.

presented with an arbitration agreement (by Wilson, the bartender), it turned out the document was an employee handbook. Based on Hensley's testimony, the Court finds that she did not receive a copy of the arbitration agreement and never had an opportunity to review it. And even if she met with Dorsey, he acknowledges telling her she did not have to sign the agreement but did not explain that she could be bound by continuing her employment. Thus, the Court finds that Hensley did not know the terms of the arbitration policy and did not know that continued employment could constitute acceptance despite her refusal to sign it. Accordingly, the Court finds that Defendants have failed to carry their burden to show that Hensley unequivocally accepted the arbitration agreement.

### 3. *Wilson*

Wilson signed the arbitration agreement in her meeting with Dorsey, and she received a copy to take home with her. While she was only presented the last page of the agreement at the time she signed it, as explained above, there is no evidence Defendants misled her or would have prevented her from reading the rest of the agreement if she had asked to. The final page stated the agreement was an arbitration agreement, and it also expressly stated that

9

continued employment would constitute acceptance. She was then given two or three pages of the three-page agreement to take with her, providing her further opportunity to review the agreement.

Wilson then came to work the following day. Continuing to work was an express method of acceptance. Courts have upheld arbitration agreements when the agreement "expressly established that the proper manner of accepting its terms was continued employment." Caley, 428 F.3d at 1374. Consequently, because Wilson both signed the agreement and continued her employment at Pleasers, the Court finds that she accepted the arbitration agreement. The Court turns to the question of unconscionability.

B.    Unconscionability

For a contract to be found unconscionable under Georgia law, there generally must be both procedural and substantive unconscionability. See, e.g., NEC Techs., Inc. v. Nelson, 478 S.E.2d 769, 773 n.6 (Ga. 1996) ("[T]o tip the scales in favor of unconscionability, most courts seem to require a certain quantum of procedural plus a certain quantum of substantive unconscionability."); Gordon v. Crown Cent. Petroleum Corp., 423 F. Supp. 58, 61 (N.D. Ga. 1976) (holding unconscionability to require both "an absence

10

of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party"). In assessing procedural unconscionability, courts consider factors such as "the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." NEC Techs., 478 S.E.2d at 771-72 (citations omitted). To determine substantive unconscionability, "courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the contract terms, the allocation of risks between the parties and similar public policy concerns." Id. at 772 (citations omitted).

Georgia law sets a high bar for the finding of unconscionability. As the Georgia Supreme Court has explained, "[a]n unconscionable contract is such an agreement as no sane man not acting under a delusion would make, and that no honest man would take advantage of." R. L. Kimsey Cotton Co., Inc. v. Ferguson, 214 S.E.2d 360, 363 (Ga. 1975) (internal quotation marks and citation omitted). Similarly stated, "[u]nconscionable conduct must 'shock the conscience.' " Mitchell v. Ford Motor Credit Co., 68 F. Supp. 2d 1315, 1318

11

(N.D. Ga. 1998) (quoting BMW Fin. Servs., N.A. v. Smoke Rise Corp., 486 S.E.2d 629 (Ga. Ct. App. 1997)).

Given the high bar for finding unconscionability, the Court concludes that the agreements at issue here were neither substantively nor procedurally unconscionable. The arbitration agreement is plainly not substantively unconscionable, and Plaintiffs do not appear to argue that it is. Notably, both parties are required to submit their claims to arbitration, although even a lack of mutuality would not render an arbitration agreement unconscionable. See Caley, 428 F.3d at 1378. Because a contract must be both substantively and procedurally unconscionable, the lack of substantive unconscionability alone defeats Plaintiffs' argument.

Even if the agreement were substantively unconscionable, the Court further finds that the process by which Plaintiffs consented to the agreements was not unconscionable. The Court recognizes that Plaintiffs lacked legal and business training and lacked equal bargaining power with their employers. As Plaintiffs testified, they needed their jobs. Still, courts have held that disparity in bargaining power is often present in the employment context and is not sufficient to show unconscionability unless circumstances show that it is

12

extremely one-sided. See id. at 1377. In Caley v. Gulfstream Aerospace Corp., for instance, the Eleventh Circuit upheld an arbitration agreement even when the agreement was announced as a new condition of employment, thus giving employees two options: "(1) continue in employment, thereby accepting the [arbitration agreement], or (2) terminate employment." Id. at 1375. The Eleventh Circuit found that such bargaining disparity was not procedurally unconscionable. Id. at 1377. What is more, Georgia courts hold that "lack of sophistication or economic disadvantage of one attacking arbitration will not amount to unconscionability." Saturna v. Bickley Const. Co., 555 S.E.2d 825, 827 (Ga. Ct. App. 2001). And, while Dorsey did not explain much if anything about the arbitration agreements during the meetings, Mitchell and Wilson were not prevented from reading the agreements, and the terms of acceptance were conspicuous on the signature page. Although the Court recognizes Plaintiffs' arguments that the circumstances surrounding the execution of these agreements were perhaps rushed, lacking in explanation, and less than straightforward, in light of the evidence and case law on unconscionability, the circumstances were not so egregious as to be unconscionable.

Finally, Plaintiffs contend that the timing of Defendants' adoption of the

13

new arbitration policy on February 14, 2014, rendered the agreements procedurally unconscionable. Plaintiffs state that Defendants instituted the new policy days after Defendants answered a separate but related collective action against them. See Cook v. S.G.T., Inc., No. 1:13-cv-03518-RWS (answer filed Feb. 10, 2014). The Court confronted a similar issue in Stevenson v. Great American Dream, Inc., No. 1:12-CV-3359-TWT, 2014 WL 3519184 (N.D. Ga. July 15, 2014). In Stevenson, the plaintiffs argued that an arbitration agreement was unconscionable because it was executed during the pendency of a collective action. Id. at *1. The Court disagreed, reasoning: "Regardless of whether there is a pre-existing collective action, the effect of the arbitration agreement is the same: it prevents the signatory from litigating her FLSA claim in a judicial forum." Id. The Court concluded that the timing of a collective action did not impact the unconscionability analysis. Id. The Court agrees with Stevenson. Plaintiffs fail to show that the circumstances and timing of the arbitration agreements amount to unconscionability.

In sum, the Court finds that the arbitration agreements are neither substantively nor procedurally unconscionable, and Plaintiffs Mitchell and Wilson are required to submit their claims to arbitration.

14

## Conclusion

For the foregoing reasons, Defendants' Motions to Compel Arbitration [6, 14] are **GRANTED in part** and **DENIED in part**. They are **GRANTED** as to Plaintiffs Mitchell and Wilson and **DENIED** as to Plaintiff Hensley. Plaintiffs Mitchell and Wilson are **DISMISSED** from this action and must submit their FLSA claims to arbitration on an individual basis.

**SO ORDERED**, this 5th day of August, 2015.

_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)